**UNITED STATES**

v.

**Kenneth E. PENN, 311 48 5151, Seaman Recruit (E–1), U. S. Navy.**

**NCM 77 1158.**

U. S. Navy Court of Military Review.

Sentence Adjudged 8 Feb. 1977.

Decided 28 Feb. 1978.

LT Philip G. Cohen, JAGC, USNR, Appellate Defense Counsel.

LT Michael C. Farrow, JAGC, USNR, Appellate Government Counsel.

Before NEWTON, Senior Judge, and GLADIS and GRANGER, JJ.

GRANGER, Judge:

Appellant was convicted by special court-martial of possessing marijuana on two occasions. A complete exposition of the facts is unnecessary, as appeal is predicated upon alleged errors committed during and after appellant's presentence hearing.

## INTRODUCTION OF NONJUDICIAL PUNISHMENT

Consonant with paragraph 75d of the *Manual for Courts-Martial, United States,* *1969* (Revised edition) and Section 0117 of the Manual of the Judge Advocate General, the prosecution introduced in evidence appellant's military records reflecting the imposition of nonjudicial punishment on four occasions. Appellant contends that this evidence was inadmissible because his nonjudicial punishment deprived him of equal protection of the law, inasmuch as all armed service personnel, save those attached to or embarked in a vessel, have the right to refuse nonjudicial punishment and to demand trial by court-martial. Appellant argues that he was not afforded the opportunity to refuse nonjudicial punishment because of his assignment to the USS JOSEPH STRAUSS, even though his ship was in port at the time such punishment was administered, and that this amounted to discrimination without rational basis. He further contends that even if there is a rational basis for discriminating against those attached to or embarked in Navy ships, ". . . allowing the Government to then turn and use those entries as prior convictions of the accused, is a clear denial of equal protection," reasoning that the use of such records in a court is not rationally related to any purpose justifying the discrimination.

To permit some service members to refuse nonjudicial punishment and summary court-martial proceedings while denying that option to others unquestionably discriminates against the latter group. As the Eighth Circuit Court of Appeals has stated, however, "Equal protection does not demand that all in the armed services, from recruit to veteran, stand on a par with respect to their service rights, duties, obligations, and the discipline applicable thereto." *Ampleman v. Schlesinger,* 534 F.2d 825, 829 (8th Cir. 1976). It is necessary, then, to determine whether this particular discrimination violates Constitutional equal protection requirements.

"While the Fifth Amendment contains no equal protection clause, it does forbid discrimination that is 'so unjustifiable as to be violative of due process.'" *Schneider v. Rusk,* 377 U.S. 163, 168, 84

S.Ct. 1187, 1190, 12 L.Ed.2d 218 (1964). In determining whether a discriminatory statute contravenes equal protection principles, the traditional test is whether there exists a rational basis for the discrimination. *McGowan v. Maryland*, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961). Under this test, legislatures are presumed to have acted within their Constitutional power, and statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it. *Id.* When the discriminating classification touches upon fundamental Constitutional rights, however, its Constitutionality must be judged by the stricter standard of whether the classification is necessary to promote a *compelling* governmental interest. *Shapiro v. Thompson*, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969).

██ Nonjudicial punishment is an administrative method of dealing with minor offenses. *Middendorf v. Henry*, 425 U.S. 25, 96 S.Ct. 1281, 47 L.Ed.2d 556 (1976); *Parker v. Levy*, 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974). It is not a criminal proceeding, and a service member subjected to such punishment does not enjoy the Fifth and Sixth Amendment protections afforded in criminal proceedings. *United States v. Booker*, 3 M.J. 443 (C.M.A.1977). Likewise, we find no other Constitutional provision, independent of the equal protection clause here invoked, which supports a right to refuse administrative punishment. In determining whether Article 15, Uniform Code of Military Justice; 10 U.S.C. § 815, deprives those attached to or embarked in vessels of due process of law, the proper test is therefore whether there is a rational basis for denying those service members the option to refuse nonjudicial punishment.

In the original Rules for the Regulation of the Navy of the United States, adopted by the Continental Congress in 1775, there were no specific limitations on the authority of the commander of a ship. Article I of those Regulations required simply that Navy commanders:

. . . discountenance and suppress all dissolute, immoral, and disorderly prac-

tices; and also, such as are contrary to the rules of discipline and obedience, and to correct those who are guilty of the same according to the usage of the seas.

Later, by regulation and by statute, limitations were placed upon the punishment naval commanders could impose as nonjudicial punishment. *See* S.Rep. No. 1911, 87th Cong., 2d Sess., *reprinted in* [1962] 2 U.S. Code Cong. & Admin.News pp. 2379, 2381. All such statutes and regulations, however, have implicitly recognized that unique responsibility of a ship's captain as the master of a frequently isolated community of sailors; the peculiar vulnerability of this independent society to disorderly practices; and hence the essentiality of affording the captain the authority to swiftly and surely "discountenance and suppress all dissolute, immoral, and disorderly practices," and to expeditiously "correct those who are guilty of the same."

Thus, prior to the enactment of the Uniform Code of Military Justice, the Articles of War permitted an accused to refuse nonjudicial punishment and demand trial by court-martial, whereas the Articles for the Government of the Navy permitted no such refusal. *A Bill to Unify, Consolidate, Revise, and Codify the Articles of War, the Articles for the Government of the Navy, and the Disciplinary Laws of the Coast Guard, and to Enact and Establish a Uniform Code of Military Justice: Hearings on H.R. 2498 Before the Subcomm. of the House Comm. on Armed Services*, 81st Cong., 1st Sess. (1949), *reprinted in* [1950] Index and Legislative History, Uniform Code of Military Justice, 926, 927.

The Congress made no attempt to reconcile these divergent practices when they enacted the Uniform Code of Military Justice, choosing instead to leave the matter to the Service Secretaries. *See* Uniform Code of Military Justice, 1951, Article 15(b).

In 1962, the Uniform Code of Military Justice was amended to permit any accused, regardless of his armed service, to refuse nonjudicial punishment and demand trial by court-martial—except an accused attached to or embarked in a vessel. Act of Sept. 7,

1962, Pub.L. No. 87–648, 76 Stat. 447 (1962); *see also* Uniform Code of Military Justice, Article 15(a). The rationale for this exception is found in the legislative history of that Act:

> Because of the testimony by the Navy, the right to demand trial by court-martial in lieu of nonjudicial punishment was not extended to those aboard ship, in view of the unique responsibilities of the ship's captain and in the interest of maintaining morale and discipline aboard ship. . . . [T]he right to demand a trial would involve . . . the question of maintaining discipline where a person aboard ship could refuse the punishment to be imposed by the commanding officer for minor infractions. [S.Rep. No. 1911, *supra*, U.S.Code Cong. & Admin.News 1962, at p. 2380].[1]

The legislative history thus clearly shows a rational basis for this statutory distinction. In his brief, however, appellant contends that even if there is justification for requiring personnel at sea to forego the right to a judicial hearing, his ship was in port on all four occasions of nonjudicial punishment, and there is certainly no justification for discriminating between those attached to a ship in port and those assigned to shore-based commands.

We are unpersuaded by this reasoning. If those attached to a ship were permitted to demand special or general court-martial for any minor offense whenever their ship was in port, commanders frequently would be confronted with totally unacceptable alternatives: (1) Leaving accused persons and all witnesses ashore when ships put out to sea; (2) regulating ships' itineraries around courts-martial; or (3) permitting minor infractions to go unpunished.

To effectively accomplish his mission, a ship's captain must have an adequate and relatively stable crew. Ship's operations and movements cannot be dictated by those few who choose to violate the law and regulations. To permit minor infractions to go unpunished defeats the very purpose of the Article 15(a) delineation between those attached to or embarked in vessels and other members of the armed forces.

▇ For these reasons, we conclude that there is a rational basis for denying those attached to or embarked in vessels the opportunity to refuse nonjudicial punishment and demand court-martial. Indeed, this classification would satisfy the more stringent test reserved for discrimination touching upon fundamental Constitutional rights, because the basis for this distinction is most compelling. The discrimination is "founded upon unique military exigencies as powerful now as in the past." *Schlesinger v. Councilman,* 420 U.S. 738, 757, 95 S.Ct. 1300, 1313, 43 L.Ed.2d 591 (1975). Its purpose is to preserve a well-disciplined and stable naval fighting force. It therefore impacts directly upon the Navy's primary business, which is ". . . to fight and be ready to fight wars should the occasion arise." *Toth v. Quarles,* 350 U.S. 11, 17, 76 S.Ct. 1, 5, 100 L.Ed. 8 (1955).

Turning to the second aspect of appellant's assignment of error—the admissibility of records of his nonjudicial punishment—we find that such records were properly admitted during the presentence hearing stage of his trial. *United States v. Johnson,* 19 U.S.C.M.A. 464, 42 C.M.R. 66 (1970); *United States v. Lecolst,* No. 77 1808, 4 M.J. 800 (N.C.M.R. 15 February 1978).

---

**1.** Another reason for not extending the right to refuse nonjudicial punishment to those attached to or embarked in ships was that the ship commander who administered nonjudicial punishment was also the summary court-martial convening authority, and, since an accused who refused nonjudicial punishment had no right to refuse a summary court-martial under extant regulations, he gained little or nothing by demanding a court-martial trial which would be conducted by an officer subordinate to the ship commander. Under present regulations, however, an accused who refuses nonjudicial punishment may also refuse a summary court-martial. *Compare* UCMJ, 1951, Art. 20 *with* UCMJ, Art. 20, 10 U.S.C. § 820. This reasoning is therefore no longer persuasive.

## PRETRIAL AGREEMENT

Two of appellant's assignments of error relate to his pretrial agreement.

Under the terms pertaining to forfeitures, if a bad conduct discharge were awarded, the convening authority could approve no forfeitures in excess of two-thirds pay for 1 month. Appellant's sentence included a bad conduct discharge, confinement at hard labor for 4 months and forfeitures of $248 per month for 4 months. The convening authority approved the sentence of forfeitures, contrary to the pretrial agreement, and ordered it executed. He took this action on 21 March 1977. The staff judge advocate addressed the matter in his review on 12 May, and the supervisory authority took his action on 26 May, at which time he cancelled the convening authority's execution order and, as to forfeitures, approved only forfeiture of $248 pay per month for 1 month.

■ Although the convening authority erred in thus failing to honor the pretrial agreement, we find that the supervisory authority effectively cured that error in his action, and no further remedial action is required. See United States v. Miller, 27 C.M.R. 586 (A.C.M.R.1958), cited with approval in United States v. Foecking, 22 U.S.C.M.A. 46, 46 C.M.R. 46 (1972).

In return for appellant's guilty plea on the two marijuana possession charges, the convening authority agreed to withdraw two other specifications alleging orders violations. One charged him with being in a restricted area; the other alleged that he failed to obey an order to lower his trousers.

Despite the guilty plea, Government counsel chose to prove his case during the presentence hearing, as he was entitled to do pursuant to paragraph 75b(3) of the Manual for Courts-Martial. Testifying on one of the marijuana offenses, the Chief Master-at-Arms stated that he was called to the reefer deck of the ship, where an ensign had discovered appellant and another individual. Government counsel then asked the witness, "And is the reefer deck a restricted area or unrestricted area?"

Following several defense objections, the witness was allowed to testify that the area was restricted.

Government counsel then elicited the following responses from the witness:

Q: What did you do in regard to Seaman Recruit Penn, the defendant in this case?

A: Chief Setser had Seaman Recruit Penn down and felt in the forward part underneath his belt.

Q: What did you do?

A: Chief Setser called me over. I informed Penn to go ahead, to drop his pants.

Q: Okay. Did you subsequently drop his pants?

A: Yes. I had to take his pants down myself.

Q: And did you have to take any additional clothing off?

A: Yes, I did, his briefs, which Chief Setser told me he had felt something.

Q: And when you removed—did you remove his briefs?

A: I pulled his briefs down at that time. There were four or five plastic bags fell out on the deck. [R. 71–72].

At this point, trial defense counsel asked for a mistrial on the grounds that the prosecution had elicited evidence of uncharged misconduct and had violated the pretrial agreement by raising the offenses the convening authority had agreed to withdraw. The trial judge denied that motion, but instructed the court members that they could not imply from this evidence any misconduct on the part of appellant, and that appellant must be sentenced only for the offenses of which he was convicted.

■ We reject appellant's contention that counsel's action violated the terms of the pretrial agreement. The pretrial agreement was unambiguous. It established a maximum permissible sentence, required appellant to plead guilty to two specifications, and required the convening authority to withdraw the remaining two. The military judge established on the record that the pretrial agreement embodied the entire

understanding and agreement between appellant and the Government. The agreement to withdraw the specified charges assured appellant he would not be prosecuted for those offenses, but it did not alter the rules of evidence for his trial on the remaining charges. He received what he bargained for, and we will not rewrite the pretrial agreement or create additional terms by implication. *United States v. Cox*, 22 U.S.C.M.A. 69, 46 C.M.R. 69 (1972).

## UNCHARGED MISCONDUCT

■ Turning to the evidentiary issue, the military judge apparently considered this evidence admissible to show the circumstances surrounding the offense. Unquestionably, the prosecution is permitted to flesh out the bare bones of the charge in order that the court members can comprehend the events which give rise to the trial. They need not be left with the impression that the offense occurred in a vacuum. *United States v. Roberts*, 18 U.S.C.M.A. 42, 39 C.M.R. 42 (1968). These two incidents of misconduct added nothing to a rendition of the facts regarding the offenses, however. They were totally disassociated from the offenses charged and served no elucidative purpose. The prosecution may only, ". . . present *appropriate* matter to aid the court in determining the kind and amount of punishment to be imposed." *Manual, supra*, paragraph 75*a* (emphasis added). This evidence of misconduct was inadmissible.

■ Mistrial is a drastic remedy. Ordinarily, an error in admitting evidence can be cured by striking the evidence and instructing the court members to disregard it. Only in the extraordinary situation, where the improperly admitted testimony is inflammatory or highly prejudicial to the extent that its impact cannot be erased from the minds of the court members, is there occasion for the military judge to grant a motion for a mistrial. *United States v. Patrick*, 8 U.S.C.M.A. 212, 24 C.M.R. 22 (1957). "[T]he guiding rule is that the surrounding circumstances must demonstrate a manifest necessity to terminate the trial to preserve the ends of public justice." *United States v. Simonds*, 15 U.S.C.M.A. 641, 644, 36 C.M.R. 139, 142 (1966).

■ We conclude that the judge properly denied the motion for a mistrial. His instruction was adequate to ensure appellant was not prejudiced by the evidence of uncharged misconduct.

## COURTROOM DEMONSTRATION

In aggravation of the offense of possessing a pound of marijuana, the Government called the officer who had found appellant with the contraband. He testified that, in the course of his duties, he went to an equipment space aboard ship and discovered appellant and a shipmate with a pile of "brown substance" lying loose on the deck beside a laundry bag and some small plastic bags. Appellant was placing small quantities of the substance in each of the plastic bags, rolling them up, and placing them in the laundry bag.

During the officer's testimony, trial counsel produced a bag of marijuana and dumped it out of its container onto a desk. He then had the witness demonstrate how appellant packaged the substance in the plastic bags. The vegetable material was not offered into evidence.

Since "seeing is believing" and demonstrative evidence appeals directly to the senses of the triers of fact, it is today universally felt that this kind of evidence possesses an immediacy and reality which endows it with particularly persuasive effect. *McCormick on Evidence* 524, 525 (2d ed. 1972).

■ Real evidence is not admissible until an adequate foundation has been laid showing that the object is *the* object which was involved in the incident and, further, that the condition of the object is substantially unchanged. *McCormick on Evidence, supra*, at 527. Real evidence should not be placed before the trier of fact unless counsel intends to introduce it into evidence and believes it is admissible. *United States v. McDowell*, 13 U.S.C.M.A. 129, 32 C.M.R. 129 (1962); *see* ABA Standards, The Prosecu-

tion Function § 5.6 (1971); ABA Standards, The Defense Function § 7.5 (1971). But if an article is offered merely to illustrate testimony, rather than as real or original evidence, its specific identity is generally of no significance whatever. Instead, the theory justifying admission of these exhibits requires only that the items be sufficiently explanatory or illustrative of relative testimony in the case to be of potential help to the trier of fact. *McCormick on Evidence, supra*, at 528.

When the evidence is more prejudicial or misleading than it is probative, it should be rejected. 1 *Underhill's Criminal Evidence*, 260, 261 (6th Ed. 1973). Whether the particular exhibit will be helpful, or will instead tend to confuse or mislead the trier of fact, is a matter within the sound discretion of the trial judge. *United States v. Thomas*, 6 U.S.C.M.A. 92, 19 C.M.R. 218 (1955).

In the case at bar, the officer's testimony regarding his discovery of appellant with the marijuana would have been admissible on the merits to show the details of appellant's possession. That testimony was also admissible at the presentence hearing.

A demonstration of how appellant was packaging the marijuana was not particularly helpful to the court members, as even the most unimaginative member could readily understand the testimony explaining that small portions of the marijuana were placed in "baggies," which were rolled into cylindrical shapes, then placed in the laundry bag. On the other hand, a large amount of marijuana displayed in the courtroom can be expected to have great emotional impact upon court members. The potential was great that the court would be misled and diverted from its legitimate duties. There was the real danger that the substance would be understood by the members to be *the* marijuana with which appellant was found. That marijuana would not be admissible absent adequate foundation.

We conclude that the trial judge abused his discretion in permitting this demonstration to be conducted, as its potential prejudicial impact far outweighed its probative value.

The military judge advised the members, however, that the purpose of this display "was to demonstrate . . . what had occurred at the time, and you're not to infer anything else from the material that was present on the table." We conclude that the judge's instruction purged this error of any prejudicial effect it might otherwise have had upon the substantial rights of appellant.

## PRESENTENCE ADVICE TO APPELLANT

The military judge advised appellant that, during the presentence hearing, appellant could testify or make an unsworn statement. He did not apprise him he could also remain silent. This omission was error. Paragraph 53*h*, *Manual for Courts-Martial, United States, 1969* (Revised edition). Appellant thereafter made an unsworn statement.

We find no prejudice resulting from this error. Appellant's guilty plea had already confirmed his commission of the offenses charged. He was not compelled to say anything damaging to his case. Without his unsworn statement, appellant's case in extenuation and mitigation would have been reduced to one character witness and medical records revealing no serious character or behavior disorders or mental illness. *United States v. Barnes*, No. 77 1785 (N.C.M.R. 6 Feb. 1978).

## APPROPRIATENESS OF SENTENCE

We overrule appellant's contention that his sentence is inappropriately severe. His military record manifests disdain for military authority and illustrates his incorrigibility. In July, 1976, appellant introduced marijuana aboard a Navy base and was nonjudicially punished. In December, 1976, he was again nonjudicially punished, this time for possession of marijuana. Almost immediately thereafter, he was apprehended with a pound of marijuana in his possession, and the present original Charge

was referred to trial. Two days after he had been informed of that charge, he was again found with a substantial amount of marijuana in his possession, which led to the Additional Charge herein. We are convinced that any court-martial, in an error-free trial, would sentence appellant to some confinement, some forfeitures, and a bad conduct discharge. His sentence, as approved below, includes confinement at hard labor for 30 days, forfeiture for 1 month, and a bad conduct discharge. Further reduction of punishment would be inappropriate.

We find no merit in appellant's remaining assignments of error.

Finding no error prejudicial to the substantial rights of appellant, we affirm the findings and sentence as approved and partially remitted below.

GLADIS, Judge (concurring in the result):

I concur in the result. Under the circumstances of this case, in view of the defense objection at trial to the introduction of certain evidence after findings on the ground that it violated the pretrial agreement, I cannot conclude on the basis of this record that introduction of the evidence did not contravene the defense understanding of the pretrial agreement. Nevertheless the accused has received what he contends he bargained for because the trial judge's ruling and curative instruction to the members were sufficient to eliminate any prejudice. Therefore it is unnecessary to decide whether the evidence was inadmissible for other reasons. I join in affirming the findings and sentence.

NEWTON, Senior Judge (dissenting):

I dissent.

This is a difficult case in that guilt and the appropriateness of the sentence are clear, but the means of arriving at those results leaves much to be desired. I would set aside the conviction and sentence and authorize a rehearing due to cumulative error. *United States v. Evans,* 18 U.S.C. M.A. 3, 39 C.M.R. 3 (1968); *United States v.*

*Donohew,* 18 U.S.C.M.A. 149, 39 C.M.R. 149 (1969); *United States v. Green,* 4 M.J. 203 (C.M.A.1978), Chief Judge Fletcher's concurring opinion at 204.

I find error: in the introduction of nonjudicial punishment records; in failure to adequately advise the accused of his allocution rights prior to sentencing; in failure to assure the accused's understanding of his pretrial agreement; and, in allowing demonstrative evidence at trial unrelated to the offenses charged. Separately, each error may have had no effect. Cumulatively, they cast substantial doubt on the fairness of this trial.

### NONJUDICIAL PUNISHMENT

I am unable to participate in my brothers' quantum jump from determination that awards of nonjudicial punishment aboard ship are lawful without the accused being afforded an opportunity to refuse punishment or consult with counsel, to their determination that there is no violation of equal protection in utilizing those records to aggravate punishment at a later court-martial on other charges. At the risk of accusation of fascination with my own words, I reiterate my dissenting opinion in *United States v. Lecolst,* 4 M.J. 800 (N.C.M.R.1978).

I disagree with my brothers in their conclusion at law. Evidence of the award of nonjudicial punishment, when the recipient is attached to or embarked in a vessel, should not be admissible to aggravate the penalty prescribed for other offenses tried at a later court-martial, as evidence of the character of prior service, unless decisional criteria recently announced are met. *See, Manual for Courts-Martial, United States, 1969* (Revised edition), paragraphs 75d and 127c; JAGMAN 0117, Article 15, Uniform Code of Military Justice; *United States v. Booker,* 3 M.J. 443 (C.M.A.1977).

*Booker* states the military law. It should be made equally applicable to all members of the United States military forces. If not, there is no equality of treatment or punishment for armed forces personnel.

By the majority decision, individuals who serve the more onerous duty at sea face the prospect of receiving punishment more harsh than their fellow servicemen on shore. I find no reason to suppose that inequality is reasonably imposed because records of nonjudicial punishment are ordinarily admissible with some exception as my brothers say, or under some esoteric legal theory involving distinction between classes as they also say. The following example illustrates the point.

A sailor on duty ashore has an option to refuse the award of nonjudicial punishment by his commanding officer. He must be advised of that right and he must be afforded an opportunity to consult with independent counsel, a lawyer, prior to opting for nonjudicial punishment. If not advised of his option, or if not afforded an opportunity to consult with a lawyer, or both, evidence of the award of that nonjudicial punishment may not be used to aggravate the penalty for another offense tried at a later court-martial. If so advised, that evidence is admissible to aggravate the later court-martial penalty. *United States v. Booker, supra.* A sailor on duty aboard ship has no option to refuse nonjudicial punishment, and, as a consequence, he has no derivative right to consult with a lawyer prior to the award of such punishment. The latter situation is by statutory fiat. Article 15, UCMJ. My brothers say that the sailor or marine assigned to duty aboard ship may reap the dubious benefit of admission of evidence aggravating his court-martial punishment, while the sailor or marine assigned to duty ashore and afforded the same treatment may not be so pilloried, because sailors and marines aboard ship are in a class by themselves. Equality and fair treatment? No!

In *United States v. Booker, supra,* the United States Court of Military Appeals evinces a clear mandate that an individual must be afforded the advice of legally trained counsel in order to permit him to make an informed decision, *i. e.* in order to give that person an opportunity to make a knowledgeable decision as to waiver of his right to appear in a trial forum for adjudi-

cation of his guilt of an offense under the UCMJ. In that context, it is waiver of trial which is the important aspect of the *Booker* decision. That is, if an individual faces punishment for an alleged offense, and if that individual feels he is innocent, he is afforded the opportunity to request trial rather than running the risk of a single individual—his commanding officer—deciding whether or not he is guilty, without benefit of an adversary legal proceeding. An individual may not desire to experience that risk. Unless he is a sailor or marine attached to or embarked in a ship (vessel) he may refuse that risk. Article 15, UCMJ.

*United States v. Booker, supra,* while it may forewarn a mandatory procedural change to summary court-martial and nonjudicial punishment proceedings under the High Court's supervisory authority as noted in *McPhail v. United States,* 24 U.S.C.M.A. 304, 52 C.M.R. 15, 1 M.J. 457 (1976), is now construed as establishing an exclusionary rule of evidence. *Cf.* SECNAV Message 012307Z, December 1977, ALNAV 073/77. That rule was established to give meaning to due process guarantees of the Fifth Amendment, and to fair treatment. *United States v. Booker, supra,* at 448.

I quarrel not with my brothers decision as to the current legality of awards of nonjudicial punishment, whether aboard ship or on shore. There is valid reason for summary punishment at sea. I part with them on the single aspect of the admissibility as aggravating evidence of awards of nonjudicial punishment as subsequent court-martial proceedings. As the above example shows, a man on board ship may be the evidentiary victim of a prior poor service record, merely because he was on duty at sea; while his shore-duty contemporary may not experience that debility, under the same disciplinary-judicial circumstance, merely because he had the good fortune to be ashore. Aside from the legal and philosophic ramifications of such a happenstance, I find nothing fair or equal in that occurrence. I do not believe a sailor at sea knowingly, intentionally, or necessarily waives equal treatment by going to sea. I am unable to agree

with my brothers because I find such a possibility abhorrent to a reasonable sense of fairness. It cannot be right. It cannot be a valid application of leadership principles, amongst which fair treatment of personnel is basic.

I would impose a requirement that shipboard commanding officers provide an accused with an option to choose a court-martial rather than nonjudicial punishment, and an opportunity to confer with independent counsel prior to opting for disposition of the case, if the evidence of imposition of that discipline is to be admissible in a subsequent court-martial trial. Of course, such a requirement has no effect, or bearing, on the authority of a commanding officer to impose nonjudicial punishment. The requirement only affects the admissibility of service record evidence at a later and different trial by court-martial. *United States v. Booker, supra*, and the need for reasonably fair and equal treatment amongst members of the military service require such action.

The above conclusion results in consideration of shipboard nonjudicial punishment records in the same manner as all other records of nonjudicial punishment under consideration in the *Booker* case. That result necessitates decision, or assumption, that the *Booker* rule is retroactive in application, or a determination that it is not retroactive. The latter determination does not seem viable. The Secretary of the Navy is responsible for promulgation of regulations as to the admissibility of records of nonjudicial punishment, paragraph 75*d* of the *Manual, supra*, and he has acted. JAGMAN 0117, and, more recently, AL-NAV 073/77, *supra*. The ALNAV, paragraph 2.M, provides that cases not finally reviewed prior to 11 October 1977 should be reviewed in accordance with *United States v. Booker, supra*. Although the ALNAV contains a disclaimer, paragraph 8, as to infringement upon the independent judgement of military judges, it is for guidance to personnel associated with military justice matters (the convening authority?). No obvious reason appears to exclude the AL-NAV from the scope of paragraph 75*d* of the *Manual, supra*. Concepts of fairness and equal treatment demand otherwise; for no good reason exists to apply the Secretary's guidance to all cases except those before this Court. The effect of ALNAV 073/77 is to apply the *Booker* rule retroactively to all cases not finally reviewed. That ALNAV nullifies any necessity to decide whether or not *United States v. Booker, supra*, is to be afforded retroactive application under the principles noted in *United States v. Jackson*, 3 M.J. 101 (C.M.A. 1977). For the Navy, the decision has been made. *United States v. Booker, supra*, is to be afforded retroactive application to all cases not finally reviewed.

I find that admission of evidence of the award of nonjudicial punishment to this accused on four occasions was erroneous.

I must note that my view as herein expressed should not be construed as expressing agreement with the rule enunciated in *United States v. Booker, supra*. I believe *Booker* sets out bad law, which substantially changes the military justice-discipline system in the armed forces. I believe that this change is detrimental to the justice system and detrimental to the disciplinary structure of the armed forces. A military justice system is a discipline system as well as a criminal law system. The *Booker* rule requires that an offender be punished at court-martial, without recourse to his past service conduct. It requires uninformed decision making by sentencing authorities. In that sense, it is unfair. It erroneously assumes Commanding Officers are inept. Its effect is detrimental to the security of this country, because it further weakens control over the military forces. Albeit unintentional, it is another drop of acid on the fabric of the military security of this country. If present trends continue—not found in our military justice system alone—that security will become dangerously eroded. Only disciplined personnel make an effective military force. However, *Booker* is the law. The wisdom of that law must be decided by the Congress and higher courts. We can but comply. Engrafting exceptions to the rule can avail little but further con-

fusion, already rampant, as to its application. As noted here, those exceptions may cause unfair and unequal treatment to military personnel. I find no merit in that course of action. The best solution is to overrule or repeal the *Booker* rule before further damage is done.

## ALLOCUTION RIGHTS

Failure to advise the accused at trial prior to sentencing that he may, *inter alia*, remain silent, is error. *United States v. Hawkins*, 25 U.S.C.M.A. 23, 54 C.M.R. 23 (Interim), 2 M.J. 23 (1976). Prejudicial, I believe. *United States v. Henry*, No. 77 1141 (N.C.M.R. 28 Sept. 1977). *See, United States v. Barnes*, No. 77 1785 (N.C.M.R. 6 Feb. 1978), dissent. (R. 30).

## PRETRIAL AGREEMENT

The accused objected to introduction of evidence prior to sentencing showing certain aggravating circumstances surrounding the offenses *sub judice*. That evidence also showed commission of other offenses which had been withdrawn pursuant to the terms of the pretrial agreement in the case. It is readily inferrable that exclusion of the questioned evidence was part and parcel of the pretrial agreement, from the accused's viewpoint. Insufficient inquiry at that stage of the proceedings resulted in failure to comply with the rule set out in *United States v. Green*, 24 U.S.C.M.A. 299, 52 C.M.R. 10, 1 M.J. 453 (1976)—the accused's understanding of the terms of the agreement was not assured, nor, was he given the opportunity to change his plea at that time. *United States v. King*, 3 M.J. 458 (C.M.A.1977). I find error from those events.

## DEMONSTRATIVE EVIDENCE

I can add nothing to the majority opinion concerning the inappropriate demonstration of how the accused was observed dividing a pile of marijuana. The problem centers around allowing Government counsel to use a bulk quantity of marijuana, never introduced at trial, in the demonstration. The evidence was irrelevant and immaterial. Its use prejudicial.

For the foregoing reasons I would set aside the conviction and the sentence. The errors are serious and too numerous to overlook.